UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| TRYNIE ELLIS, | ) | C/A No. 0:15-CV-3322-MBS-KDW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARRELSON NISSAN OF SOUTH | ) | REPORT AND RECOMMENDATION |
| CAROLINA, LLC; LOUIS F. | ) | |
| HARRELSON; AND ROBERT | ) | |
| HARRELSON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This employment-related matter is before the court for issuance of a Report and Recommendation ("Report") pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.). Two motions are pending: the Motion to Dismiss the original Complaint in full pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 4, which was filed by all Defendants—Harrelson Nissan of South Carolina, LLC ("Dealership"); Louis F. Harrelson ("LH"); and Robert Harrelson ("RH");[1] and the motion of Plaintiff Trynie Ellis ("Plaintiff" or "Ellis") to amend her Complaint to provide additional facts and refinement to the claims in her original Complaint and to add two causes of action. ECF No. 11. As discussed within, Defendants oppose Plaintiff's Motion to Amend on futility grounds. Because the court reviews a futility challenge to a proposed amended complaint and a Rule 12(b)(6) motion using the same standard, *e.g., Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011), the district judge's order concerning this Report will render the Motion to Dismiss moot. *See, e.g., In re MI Windows & Doors, Inc. Products Liab. Litig.*, No. 2:12-CV-02269-DCN, 2013 WL 3207423, at *5 (D.S.C. June 24, 2013) (finding Rule 12 motion rendered moot based on court's partial grant

---

[1] Ordinarily the court refers to individual Defendants by their last names. For clarity's sake, initials are used herein.

of plaintiff's motion to amend pleading). For the reasons set forth below, it is recommended that Plaintiff's Motion to Amend be *granted in part and denied in part.*[2]

I.     Factual and procedural background

On July 10, 2015, Plaintiff filed this action in the Court of Common Pleas in York County, asserting claims against Dealership, LH, and RH for assault, negligent supervision and retention, and wrongful termination in violation of public policy; she asserted claims against Dealership for harassment, discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964. Compl., ECF No. 1-1. Defendants removed the matter on August 20, 2015, and on August 27, 2015, filed a Motion to Dismiss the Complaint in its entirety. ECF No. 4. Plaintiff opposed the Motion to Dismiss, ECF No. 8, and Plaintiffs submitted a Reply, ECF No. 10. On October 1, 2015, Plaintiff moved to amend her Complaint, submitting a Proposed Amended Complaint ("PAC") that includes additional facts as to the causes of action in the Complaint and adds claims against RH for tortious interference with contracts and for slander. PAC, ECF No. 11-1.

Taken from the PAC and accepted as true for purposes of this Report, Plaintiff alleges the following potentially relevant facts:

Plaintiff worked for Defendants for over 10 years. The 10-year span is comprised of two separate periods. This litigation is based on her most recent span of employment by Defendants, during which she worked as Controller for Dealership from March of 2010 until October 23, 2013. PAC ¶¶ 7-8. During this period, Plaintiff worked between 60-70 hours per week on

---

[2] The undersigned is considering the initial Complaint and Defendant's Motion seeking to dismiss it as superseded by Plaintiff's Motion to Amend and Proposed Amended Complaint ("PAC"). In the event the district judge determines it appropriate to consider the pending Motion to Dismiss itself, it may be considered based on Plaintiff's PAC. It follows that the undersigned's recommended rulings based on whether Plaintiff's PAC should be dismissed as futile will mirror Defendants' motion-to-dismiss challenges. Because Defendants' futility challenge includes arguments from their Motion to Dismiss, this distinction seems to be academic.

average. *Id.* ¶ 16. Plaintiff avers her work met and exceeded her employers' legitimate expectations. *Id.* ¶ 17. LH and RH are both "managing agents" of Dealership. *Id.* ¶¶ 2-3.

Plaintiff states that in 2013 she was subjected to two separate assaults by Dealership employees Maurice Sutter and Brian Dancey. PAC ¶ 20-64. The first alleged assault involved Sutter, a salesman at Dealership. *Id.* ¶ 21. Sutter had damaged a Dealership-owned golf cart. Dealership policies required that Sutter pay for that damage. *Id.* ¶¶ 21-23. As Dealership's Controller, Plaintiff advised Sutter the cost of the repair would be deducted from his payroll checks. *Id.* ¶¶ 22-24. Sutter responded to this confrontation by returning to the Dealership with several family members and "loudly told those working at the dealership that he and his family were there to 'beat up' [Plaintiff]." *Id.* ¶¶ 26-27. Plaintiff was far outsized by Sutter, and she was aware he could harm her. *Id.* ¶¶ 30-32. Sutter first made these and other remarks in Plaintiff's office, but "continued to rant and threaten [Plaintiff] as he went through the showroom, screaming at [Plaintiff]." *Id.* ¶¶ 28, 34. RH had been in Plaintiff's office when Sutter came in, heard Sutter's remarks, but walked out of the office "rather than intervening." *Id.* ¶ 28. Sutter continued to yell and threaten her until the police were called, leaving only when the police actually arrived at the dealership. *Id.* ¶¶ 33-36. Sutter quit his job shortly after this incident, but was rehired "almost immediately" by LH over Plaintiff's objections. *Id.* ¶¶ 37-41.

Plaintiff alleges Sutter's alleged assault was "motivated at least in part by her gender," and that he made several of his threatening remarks in front of RH as well as other coworkers. *Id.* ¶ 28 (indicating Sutter "called [Plaintiff] a 'bitch'" and often "referred to women employees and customers in very demeaning terms, including 'fat bitches' and 'little bitches.'"). Plaintiff also avers LH's dismissal of Plaintiff's complaint about Sutter and decision to re-employ Sutter "were motivated at least in part by [Plaintiff's] gender." *Id.* ¶ 41. Plaintiff alleges LH "expected

females to know that they were supposed to act subordinate to men," and did not mind if male employees used profanity, but objected to female employees' using it. *Id.*

The assault involving Dancey took place in October 2013. *Id.* ¶ 42. Months before, in March 2013, Plaintiff indicates that Dancey, who had an "extensive criminal record," had attacked a coworker, Jeremy Price in front of employees and customers. *Id.* ¶¶ 43-46. Dancey allegedly used a blackjack and his fist to attack Price, who was seated in the Dealership's showroom. That assault was witnessed by customers and employees. Plaintiff indicates LH had told a male employee that it was "none of his f**king business" when that employee was giving a statement to the police about the incident involving Price, and that the employee would be fired if he did not return to work. *Id.* ¶¶ 47-48. Dancey was not terminated after the incident, but Price was. *Id.* ¶¶ 49-51.

On October 11, 2013, Dancey entered Plaintiff's office threatening to "f**k [her] up." *Id.* ¶ 53. According to Plaintiff, Dancey "came at" Plaintiff, "his face full of rage, stuck his finger in her face, and leaned over within inches of her face[,]" allowing spit to get onto her cheek. *Id.* Coworker Michelle Rodriquez witnessed the incident and called 911 to report it. *Id.* ¶ 54. Before the police arrived, LH went into Plaintiff's office, "laughing out loud." *Id.* ¶ 55. When police arrived on the scene, LH and Dancey met them, and LH told the police to "get off [his] property." *Id.* ¶ 57. In Plaintiff's presence, LH told the police that "'nobody's filing a complaint,'" and that they needed to leave. *Id.* According to Plaintiff, a police incident report of October 11, 2013 indicates Dancey was charged with disorderly conduct offering violence. *Id.* ¶ 58.

On October 13, 2013, Plaintiff texted RH stating she wanted Dancey "'gone from the dealership, and that he had threatened" Plaintiff and her family. *Id.* ¶ 59. Dancey was not

terminated, but he was sent to work at a used car lot that was near Dealership and returned to Dealership within a few days. *Id.* ¶ 61. RH responded to Plaintiff's texts about Dancey on October 15, 2013. *Id.* ¶ 64.

Plaintiff submits Dancey's assault on her was motivated in part by her gender, because "Dancey often referred to women employees and customers in very demeaning terms, including 'whores' and 'bitches.'" *Id.* ¶ 53. Plaintiff avers the response of RH and LH to the assault by Dancey was motivated by her gender, because "[LH] expected females to act subordinate to men, and objected to female use of profanity," and "RH ignored the complaints of female employees while he was far more responsive to the concerns of male employees." *Id.* ¶ 62.

When Plaintiff returned to work on October 16, 2013, she was immediately confronted by LH with complaints about her work—complaints Plaintiff "later discovered were false." *Id.* ¶¶ 81-82. Over the next few days, RH told Plaintiff he had "had enough" and he would fire her for insubordination if she wanted him to. *Id.* ¶ 82. RH told Plaintiff that she was "acting crazy," and that she could quit if she wanted to. *Id.* ¶¶ 83-85.

On Friday, October 18, 2013, Dancey was on the premises when Plaintiff returned from lunch. Believing she had a "no contact" order in place against Dancey, Plaintiff called the police. *Id.* ¶ 86. RH told her to stop calling the police. *Id.* ¶ 87. Plaintiff alleges that she then received a text message from RH telling her he was not firing her, but he was demoting her to the position of an assistant office manager to the new controller. *Id.* ¶ 88. When Plaintiff asked for the reason, RH replied "Need a change . . . Attitude." *Id.* Plaintiff responded by questioning whether RH was okay with someone threatening her and her family and noting he had done nothing about it. *Id.*

That following Monday, October 21, 2013, RH met with Plaintiff and indicated he had decided he was not going to demote her, but that he was hiring an assistant to work for her. *Id.* ¶ 89. RH told Plaintiff she needed to "'pull back'" on her aggressiveness. *Id.* On Wednesday, October 23, Plaintiff alleges that she and LH had a "lengthy discussion about paperwork discrepancies" regarding amounts the Dealership owed an auction. *Id.* ¶ 90. By the end of the discussion LH screamed at Plaintiff and fired her. *Id.* Plaintiff told RH about it, packed most of her belongings, and left the Dealership. *Id.*

Plaintiff submits LH had no legitimate basis for terminating her. *Id.* ¶ 91. She alleges her termination was "motivated at least in part due to her gender including her repeated complaints about and opposition to sexual harassment, and her clear statements that she wanted Brian Dancey to be fired, her refusal to stop talking with the police when they came to the dealership the day of the assault, her repeated phone calls to the police, complaints about Dancey's presence and statements that she would pursue criminal charges against him which were filed." *Id.* ¶ 92.

Following Plaintiff's termination, her former coworker Rodriguez appeared in court to testify against Dancey in November 2013. PAC ¶ 93. The case was postponed. Plaintiff submits on information and belief that LH and RH were aware of Rodriguez' presence in court. *Id.* Rodriguez was terminated the following day. *Id.*

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 21, 2014, and received a right-to-sue letter from the EEOC within 90 days of filing this litigation. PAC ¶ 94.

Plaintiff has applied for numerous positions at other car dealerships, and she had been offered a position in an accounting office at Hendrick Automotive Group ("Hendrick") on June 16, 2015. PAC ¶¶ 98-100. However, on June 17, 2015, Plaintiff was notified that Hendrick could

not offer her a position. She subsequently was told that she could not be hired because of an allegation that she had embezzled money from a former employer. *Id.* ¶¶ 101-02. Plaintiff asserts RH, or someone acting on his behalf, gave Hendrick false information to prevent her from being hired by Hendrick. *Id.* ¶¶ 104-05.

II.    Legal standard

Rule 15(a)(2) of the Federal Rules of Civil Procedure states, "The court should freely give leave [to amend] when justice so requires." The Supreme Court has construed the phrase "when justice so requires" in Rule 15 to preclude granting leave to amend when any of the following are found to exist: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S.178, 182 (1962).

The Fourth Circuit Court of Appeals ("Fourth Circuit") instructs that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Pittston Co. v. United States,* 199 F.3d 694, 705 (4th Cir. 1999). Whether to grant leave to amend is committed to the court's discretion. *Foman*, 371 U.S. at 181. "[W]hile the trial court is given discretion to deny amendment, that discretion is limited by the interpretation given Rule 15(a) in *Foman* 'and by the general policy embodied in the Federal Rules favoring resolution of cases on their merits.'" *Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274, 279 (4th Cir. 1987) (citation omitted). Upholding the letter and the spirit of this rule, "leave to amend a pleading should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards v. City of Goldsboro,* 178 F.3d 231, 242 (4th

Cir. 1999) (quoting *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir. 1986)) (emphasis in original).

When, as here, the defendant challenges the amendment on futility grounds, the Fourth Circuit has counseled that "[f]utility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: '[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules.'" *Katyle,* 637 F.3d at 471 (alteration in original) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 376 (4th Cir. 2008)). Accordingly, the Rule 15(a) futility analysis "requires a preliminary assessment of the allegations of the proposed amendment in light of the substantive law on which the additional claims are based." *Kramer v. Omnicare ESC, LLC,* 307 F.R.D. 459, 463-64 (D.S.C. 2015). That stated, the court must bear in mind that "[u]nless a proposed amendment may clearly be seen to be futile because of substantive or procedural considerations, conjecture about the merits of the litigation should not enter into the decision whether to allow amendment." *Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4th Cir. 1980) (citation omitted).

In considering the sufficiency of a proposed amended complaint, the familiar Rule 12(b)(6) applies. *Bartley v. Wells Fargo Bank, NA*, No. CIV.A. 3:14-3814-CMC, 2015 WL 5158708, at *3 (D.S.C. Sept. 2, 2015). "A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). The court measures the legal sufficiency by determining whether the complaint meets the Rule 8 standards for a pleading. *Id.* The Supreme Court considered the issue of well-pleaded allegations, explaining the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement
> of the claim showing that the pleader is entitled to relief," in order to "give the

> defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . .

550 U.S. 544, 555 (2007) (internal citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citing *Twombly*, 550 U.S. at 556)). When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). The court is also to "'draw all reasonable inferences in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)). Although a court must accept all *facts* alleged in the complaint as true, this is inapplicable to legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citation omitted). While legal conclusions can provide the framework of a complaint, factual allegations must support the complaint for it to survive a motion to dismiss. *Id.* at 679. Therefore, a pleading that provides only "labels and conclusions" or "naked assertion[s]" lacking "some further factual enhancement" will not satisfy the requisite pleading standard. *Twombly,* 550 U.S. at 555, 557. Further, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). At bottom, the court is mindful that a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Coleman v. Md. Ct. of Apps.,* 626 F.3d 187, 190 (4th Cir. 2010) (internal quotation marks omitted).

III.    Analysis

   A.  Plaintiff's proposed amendment: unchallenged claims

As Plaintiff points out, Defendants do not challenge the harassment portion of her Title VII claim, nor do they challenge her newly added causes of action for slander and intentional interference with contract against RH. *See* Pl.'s Reply 1. To be sure, Defendants challenged the harassment claim in moving to dismiss the original Complaint. Defs.' Mem. in Support of Mot. to Dism. 13-18, ECF No. 5. However, the PAC includes additional allegations relative to this claim. *See* Pl.'s Mot. Amend.[3] Although Defendants challenged other portions of the Title VII claim in opposing the amendment, their response is silent as to the harassment claim.

The undersigned agrees with Plaintiff that—irrespective of the outcome of Defendants' futility arguments—her Title VII claim of harassment (based on a hostile work environment), and her claims for slander and for intentional interference with contract claims should be permitted to go forward. Defendants have not challenged these claims here, and to permit them to go forward is appropriate pursuant to Rule 15's liberal permissiveness of amendment.

   B.  Plaintiff's proposed amendment: futility argument as to remaining causes of action

     1.  Plaintiff's first cause of action: Assault against all Defendants

Plaintiff's First Cause of Action asserts a claim against all three Defendants for assault, based upon the acts of Sutter and Dancey. PAC ¶¶ 107-22. She takes the position that Dealership "ratified" the assaults "through its managing agents, [LH and RH]," because it knew of the assaults and retained Sutter and Dancey as employees. *See id.* ¶¶ 112-19.[4]

---

[3] To the extent Defendants' earlier Rule 12(b)(6) challenge to Plaintiff's harassment claim is considered, the undersigned is of the opinion that the proposed amendment provides sufficient information to survive that challenge. See discussion below.

[4] Neither Plaintiff's Complaint nor the PAC names Sutter or Dancey as Defendants.

Defendants submit the assault claim is barred by the exclusivity provision of the South Carolina Workers' Compensation Act (the "Act") and Plaintiff's theory of "ratification" is insufficient to impose upon any of the Defendants vicarious liability for the actions of Sutter and Dancey. The undersigned agrees with Defendants and recommends a finding that her assault claim be dismissed because including it in any amended pleading would be futile.

The exclusivity provision provides in relevant part as follows:

> The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.

S.C. Code Ann. § 42-1-540. The South Carolina Supreme Court has looked to the statutory intent of this exclusivity provision and determined the Act is to be liberally construed in favor of finding matters to be covered by the Act. *See Peay v. U.S. Silica Co.,* 437 S.E.2d 64, 65-66 (S.C. 1993). Such construction, then, requires courts to give "the intentional injury exception [] its most narrow construction." *Id.* at 65. The "intentional" conduct has been strictly construed and includes "only those injuries inflicted by an employer with a deliberate or specific intent to injure[.]" *Id.* In so defining "intentional" the court expressly rejected the argument that an employer may have "intended" to harm an employee if the employer did not desire harmful consequences but knew that such consequences were "substantially certain" to result. *Id.* at 66. In addition, claims for "assault and battery caused by the action of another employee are within the scope of the Act since these actions arise from personal injury." *Dickert v. Metro. Life Ins. Co.,* 428 S.E.2d 700, 701 (S.C. 1993) (citing *Loges v. Mack Trucks,* 417 S.E.2d 538 (S.C. 1992)).

As explained by the South Carolina Supreme Court, "It is only when the tortfeasor/co-employee is the 'alter ego' of the employer that the liability falls outside the scope of the Act."

*Dickert*, 428 S.E.2d at 701 (holding that the Act provided plaintiff's exclusive remedy for claims arising from assaults by her direct supervisor). The alter-ego exception applies only to "'dominant corporate owners and officers.'" *Id.* (quoting 2A Larson, *Workmen's Compensation*, §§ 68.21 and 68.22).

Here, Defendants do not dispute that LH and RH arguably would be considered alter egos of Dealership. However, they submit the intentional-act exception is inapplicable because Plaintiff has not alleged that either they or Dealership acted with the requisite intent. Defs.' Mem. 9 (citing *Peay*). Defendants submit Plaintiff's allegation in paragraph 122 of the PAC that Defendants acted "maliciously, willfully or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights" is insufficient to satisfy the strict definition of intent applicable herein. Further, Defendants argue that—even if accepting as true that Dancey or Sutter acted with "intent" sufficient to satisfy the strict definition—such intent does not operate to bind Dealership. Defs.' Mem. 10. Defendants claim that, because Sutter and Dancey were co-employees (and not alter egos), their actions are not imputable to Dealership for purposes of the Act's intentional-action exception. *Id.*

In response, Plaintiff submits she has pleaded the "intent" required, pointing to her allegations that alter egos LH and RH "acted affirmatively to ratify" the harmful acts of both Sutter and Dancey. Pl.'s Reply 4-5. (citing PAC ¶¶ 113 (Sutter) and 119 (Dancey)). Those paragraphs provide as follows:

> 113. Defendant [Dealership] through its managing agents, [LH and RH], acted affirmatively to ratify the actions of Maurice Sutter by retaining him in employment and rehiring him, and failing to take appropriate and effective action against their Salesman, Sutter.

> 119. Defendant [Dealership] through its managing agents, [LH and RH], acted affirmatively to ratify the actions of Brian Dancey by retaining him in employment and failing to take appropriate and effective action against Brian

12

> Dancey as well as by interfering with the police investigation, telling the police to
> leave the premises, bailing Dancey out of jail, telling [Plaintiff] that the Dancey
> situation was only a personnel matter, and firing witness Michelle Rodriguez after
> she appeared in court to testify against Dancey.

PAC ¶¶ 113, 119. Plaintiff's theory is that she has demonstrated the requisite intent on the part of Dealership because Dealership—through its alter egos LH and RH—"affirmatively ratified" the actions of Sutter and Dancey by, *inter alia*, retaining Sutter and Dancey. Pl.'s Mem. 4-5. She submits that a different result would be contrary to public policy. *Id.* (citing *Dickert*).

Having reviewed in detail the arguments of Plaintiff and Defendants regarding Plaintiff's after-the-fact "ratification" theory, the undersigned agrees with Defendants that such an extension would move the intentional-tort exception to the exclusivity of the workers' compensation remedy well beyond the rather strict parameters set out by South Carolina's legislature and as interpreted by her courts. Plaintiff has provided no controlling or even persuasive authority that permits alter egos (the "agents" in this argument) to "intentionally ratify" an intentional tort such that the employer (the "principal" for purposes of this analysis) would lose the benefit of the Act's exclusivity provision. The general cases Plaintiff cites in support of the ratification argument, *see* Pl.'s Reply 3-4, do not involve the exclusivity provision. As in *Jones v. Family Health Centers, Inc.*, No. 5:14-CV-00174-JMC, 2014 WL 4129574, at *3 (D.S.C. Aug. 19, 2014), Plaintiff has pointed to "no South Carolina case directly confronting the question of whether the exclusivity provision constitutes a bar that has applied this exception beyond the circumstance where the alter ego is the alleged harasser." In *Jones*, the plaintiff sought to pursue an intentional-infliction-of-emotional-distress claim against her employer because the employer's alter ego knew of her purported harasser's conduct but still required her to work alongside the harasser. 2014 WL 4129574, at *3.

13

The after-the-fact actions of Dealership's alter egos LH and RH should not be permitted to operate to do what South Carolina law does not permit—*i.e.*, allow a common-law suit against co-employees who are not themselves alter egos of the employer. Plaintiff's reliance on *Dickert* does not require a different result. *See* Pl.'s Reply 4-5. In *Dickert*, the court found the Act's exclusivity provision "may not be used as a shield for a co-employee's injurious conduct." 428 S.E.2d at 702. However, contrary to Plaintiff's implicit interpretation of that language, the court was examining whether the Act's exclusivity provision shielded the co-employee himself against actions brought against the co-employee directly. *Id.*; *see also Bailey v. Five Star Quality Care, Inc.*, No. 0:13-CV-00196-JFA, 2014 WL 897113, at *4 (D.S.C. Mar. 6, 2014) (citing *Dickert* and noting "South Carolina law indicates that the exclusivity provision of the Act does not extend to claims alleging intentional torts directly against the alleged bad actor himself when the plaintiff alleges 'deliberate or specific intent' to injure him."). The *Dickert* court was not considering whether acts of an alleged tortfeasor/co-employee who was not the employer's alter ego could be imputed to the employer. As explained by the Fourth Circuit, in the *Dickert* decision, the South Carolina Supreme Court did not create a new rule, but "merely refused to expand the types of employees whose actions may be considered actions of the employer[.]" *Bryant v. INA Bearing Co.*, 14 F.3d 593, at *2 (4th Cir. 1993).

Here, Plaintiff has chosen not to sue co-employees Sutter and Dancey individually. Applicable law does not support Plaintiff's attempt to hold Dealership responsible for their alleged intentional acts based on an after-the-fact ratification theory. Because the intentional-act exception to the exclusivity of workers' compensation remedies is to be construed narrowly, the undersigned recommends a finding that Plaintiff's assault claim against Dealership would be

futile as it cannot survive a Rule 12(b)(6) challenge. It would prove futile to permit that portion of her assault cause of action to go forward.

Plaintiff also includes LH and RH as Defendants in her assault cause of action. Those portions of her assault claim should fail for similar reasons. As explained in her Reply, Plaintiff's theory is the alleged conduct of LH and RH in permitting Sutter and Dancey to return to work, as well as their conduct surrounding Dancey's criminal charges, operated to "ratif[y] the assaults" of co-employees Sutter and Dancey and the conduct was "intentional" enough to remove LH and RH from the protection of the workers' compensation laws. Pl.'s Reply 5. *See also* PAC ¶ 19 (listing actions by which Dealership, LH, and RH allegedly "acted affirmatively to ratify" the actions of Sutter and Dancey).

As noted above, the undersigned is unpersuaded by Plaintiff's legal theory that LH and RH "ratified" Dancey's or Sutter's actions by their later conduct. Further, this claim should fail because Plaintiff has not alleged that either Sutter or Dancey was an agent of LH or RH *themselves*. Without a principal-agent relationship, there can be no agency. *See, e.g., Stiltner v. USAA Cas. Ins. Co.*, 717 S.E.2d 74, 78 (S.C. Ct. App. 2011) (listing elements of ratification, including "acceptance *by the principal* of the benefits of *the agent's* acts" (emphasis added)). Accordingly, Plaintiff cannot establish that any actions of Sutter or Dancey were undertaken as agents of LH or RH, acting on the behalf of LH or RH. Plaintiff has failed to state an assault claim against either LH or RH individually. Her assault claim against each of these Defendants cannot survive a Rule 12(b)(6), and should be dismissed as futile.

Because the alleged assaults fall within the purview of the Act and no exception to coverage under the Act applies, Plaintiff should not be permitted to seek a common-law remedy

for the assault claim, and her First Cause of Action should be dismissed against all Defendants. Plaintiff's proposed amendment is futile with respect to this claim.

### 2. Plaintiff's Second Cause of Action: Negligent Supervision and Retention against all Defendants

Plaintiff's PAC also includes a claim of negligent supervision and retention brought against all Defendants. PAC ¶¶ 123-28. Plaintiff avers that Dealership, "by and through its owners and management officials, and Defendants [LH and RH]" had control over Sutter and Dancey but "refused and failed to take remedial and corrective action to protect Plaintiff Ellis." *Id.* ¶ 124. She submits that Defendants were "careless and negligent" in exercising due care in the supervision and retention of their employees and that Defendants' actions and inactions amounted to "gross negligence." *Id.* ¶¶ 125, 128. Defendants argue this cause of action is also barred by the Act's exclusivity. *See* Defs.' Mem. 13 (citing several cases for proposition that a claim for *negligent* supervision and retention is barred by § 42-1-540 of the Act, and, by definition, cannot fall within the *intentional* action exception).

As an initial matter, it appears Plaintiff may have abandoned the negligent supervision and retention cause of action. Although it appears in both the Complaint and the PAC, Plaintiff does not reference this cause of action at all in responding to Defendants' futility challenge. *See generally* Pl.'s Reply (not referencing negligent-supervision-and-retention claim at all). *See, e.g., Eady v. Veolia Transp. Servs., Inc.,* 609 F. Supp. 2d 540, 560–61 (D.S.C. 2009) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."). Accordingly, without further analysis the court appropriately may dismiss the negligent supervision and retention cause of action and find its inclusion in the PAC would be futile.

Further, to the extent Plaintiff seeks to continue this claim, the undersigned agrees with Defendants' argument that the Act provides the exclusive remedy for plaintiffs seeking to assert claims for negligent supervision and retention against their employers. *See, e.g., Sabb v. S.C. St. Univ.*, 567 S.E.2d 231, 233 (S.C. 2002) (citing *Dickert*, 428 S.E.2d 700). Simply stated, the only arguable exception to the exclusivity of workers' compensation that could apply to this claim is the intentional action exception discussed above. A claim based on "negligence" cannot, by definition, be considered "intentional." *See Bradley v. U.S. Foods, Inc.*, No. 4:14-CV-1772-RBH, 2015 WL 5158731, at *26 (D.S.C. Sept. 2, 2015) ("[A] cause of action for *negligent* retention and supervision is, by definition, not an *intentional* act.") (emphasis in original); *Sutton v. Securitas Sec. Serv., USA, Inc.,* No. 4:13–2542–MGL, 2014 WL 1513867, at *4–5 (D.S.C. Apr. 16, 2014) (dismissing plaintiff's negligent retention and supervision claims on grounds that they are barred by the Act); *Sabb,* 567 S.E.2d 231 (negligent supervision). For reasons noted above, any continued reliance on a ratification theory would be unsuccessful as to this cause of action, as well. Because the Act provides Plaintiff with her exclusive remedy to recover on this claim, she has failed to state a claim herein; Plaintiff's second cause of action for negligent supervision and retention should be dismissed as futile.

C. Wrongful termination in violation of public policy

Next Plaintiff brings a state-law-based cause of action for wrongful termination in violation of public policy. PAC ¶¶ 129-35. She argues Defendants terminated her, at least in part, for her participation in the "administration of justice" as concerning criminal charges and proceedings against Dancey. *See* Pl.'s Reply 9-13.

Defendants acknowledge South Carolina law recognizes another narrow exception to the employment-at-will doctrine such that an at-will employee cannot be terminated in retaliation when such termination violates a "clear mandate of public policy." Defs.' Mem. 14 (quoting

*Barron v. Labor Finders of S.C.*, 713 S.E.2d 634, 636 (S.C. 2011)). The "determination of what constitutes public policy is a question of law for the courts to decide." *Barron,* 713 S.E.2d at 638; *see Desmarais v. Sci. Research Corp.*, No. 2:15-CV-00634-DCN, 2015 WL 6725672, at *3 (D.S.C. Nov. 3, 2015) (citing *Barron* and determining at summary-judgment stage that the plaintiff had not set out a "clear mandate of public policy").

South Carolina's courts have recognized two clear situations in which the public policy exception applies: (1) where the employer requires the employee to violate the law; or (2) where the termination itself is a violation of the criminal law. *See Barron*, 713 S.E.2d at 637. The public-policy exception is not limited to these two situations, however. *Id.*

In a case on which both Plaintiff and Defendants rely—*Taghivand v. Rite Aid Corp.*, 768 S.E.2d 385 (S.C. 2015)—the South Carolina Supreme Court considered whether an at-will employee had a cause of action for wrongful termination in violation of public policy when that employee had reasonably suspected that criminal activity (shoplifting) had occurred on the employer's premises, reported the activity to law enforcement, and was terminated in retaliation for making such a report. The employee argued that the public-policy exception should apply to protect the good-faith reporting of a crime, based upon S.C. Code § 16-9-340's prohibition against intimidating or impeding a witness, the common law prohibition against obstruction of justice, and/or S.C. Code § 16-3-1505, containing the legislative intention section of South Carolina's Victim and Witness Service Act and a general statement of public policy in favor of reporting suspected crimes. *See* 768 S.E.2d at 387. In that instance, the court considered and rejected all three arguments, noting the following:

> Unquestionably, society benefits from citizenship participation in the criminal justice system, and no one can reasonably dispute that reporting the commission of a crime is a commendable act. However, the question before us today is not whether this state applauds citizen participation in the criminal justice system, but

whether this interest mandates an exception to the at-will employment doctrine. Moreover, the public policy of this state finds expression in our longstanding adherence to at-will employment; any exception to this doctrine, which is itself firmly rooted in the public policy of this state, should emanate from the General Assembly, and from this Court only when the legislature has not spoken. Absent a more clear and articulable definition of policy from the General Assembly regarding those who report suspected crimes, we refuse to broaden the exception to the at-will employment doctrine today.

768 S.E.2d at 389. In considering the question before it, *Taghivand* counseled that courts are to "exercise restraint when undertaking the amorphous inquiry of what constitutes public policy." *Id.* at 387.

Relevant to the court's analysis here is the *Taghivand* court's consideration of the public policy derived from S.C. Code Ann. § 16-9-340, the statute on which Plaintiff also relies. Section 16-9-340 provides in pertinent part as follows:

Intimidation of court officials, jurors or witnesses.

(A) It is unlawful for a person by threat or force to:

(1) intimidate or impede a judge, magistrate, juror, or potential juror or witness; . . . in the discharge of his duty as such; or
(2) destroy, impede, or attempt to obstruct or impede the administration of justice in any court.

S.C. Code Ann. § 16-9-340(A).

In *Taghivand*, the plaintiff had been terminated because he made a good-faith—albeit ultimately incorrect—report to law enforcement of suspected shoplifting. *See Taghivand*, 768 S.E.2d at 386. Among other arguments, he contended that his termination violated South Carolina's public policies because it violated Section 16-9-340, which prohibits intimidation of court officials, jurors, and witnesses. *See id.* at 387. In considering this argument, the South Carolina Supreme Court wrote:

Taghivand's argument is that section 16-9-340 protects those involved in legal proceedings—potential witnesses included—from intimidation or interference

that is connected with their role in the proceedings. As an extension, Taghivand argues that the public policy behind this statute should give rise to his cause of action for wrongful termination.

The fallacy underlying Taghivand's argument is that his employer terminated him *in response* to the reporting of a crime, not to influence or impede his further involvement in any proceeding related to that crime. **The thrust of Taghivand's argument is not that section 16-9-340 applies to him as a potential witness in the reported shoplifting**, but rather, that a broad public policy favoring the reporting of crimes can be derived from the legislature's decision to protect potential witnesses. We find the plain language of the statute does not support his assertions. **Taghivand was not prevented by threat or force from participating in a legal proceeding**; he was discharged for incorrectly reporting a crime. Without a more definite statement from the General Assembly that the reporting of crime should be protected, we refuse to read such a policy into this statute.

768 S.E.2d at 387 (bolded emphasis added). Here, Plaintiff submits she was terminated in part based on her dealings with law enforcement regarding Dancey's actions. Because Taghivand's termination was the result of his *reporting* a potential crime, his public policy argument based on S.C. Code Ann. § 16-9-340 failed. Plaintiff avers her PAC includes allegations based on more than a termination resulting from her reporting criminal activity. Rather, Plaintiff submits her PAC sets out sufficient circumstantial evidence to support her claim that her termination violated public policy. Pl.'s Reply 9-12.

Plaintiff points to the introduction to the PAC in which she alleges her complaints to law enforcement about the alleged assaults, "opposition to these and other acts of sexual harassment and determination to pursue a criminal complaint about the second assault resulted in retaliation." PAC 1. Plaintiff submits that she was "fired at least in part, because she refused to go along with [LH's] attempts to obstruct and impede the administration of justice, which violated the South Carolina public policies set forth in S.C. Code 16-9-340." Pl.'s Reply 9-10. In support of her proposed amendment and in opposition to Defendants' futility challenge, Plaintiff

catalogs the following portions of her proposed pleading as setting out sufficient circumstantial

evidence to proceed on this claim:

- ¶¶ 53-56: Detailing the events of October 11, 2013, when Dancey threatened Plaintiff with serious bodily harm and co-worker Rodriguez called the police;

- ¶ 57: Averring that, when police arrived, LH and Dancey were standing together and LH instructed the police to "get off [his] property;"

- While the police were at the Dealership on October 11, 2013, LH told them to leave on three separate times;

- LH told the police in Plaintiff's presence that "nobody's filing a complaint," and that they needed to "go on and go." While the police were at the facility, [LH] told them to leave three separate times;

- ¶¶ 58, 63: LH bailed Dancey out of jail after Dancey was charged with disorderly conduct offering violence on October 14, 2013;

- ¶ 62: LH and RH refused to discipline Dancey and permitted him to return to work several days after the alleged assault on Plaintiff;

- ¶¶ 57, 86-87, 89: On October 18, 2013, Plaintiff called the police about Dancey's presence at the Dealership because she believed there was a no-contact order against his being there; RH learned of this and advised Plaintiff to "stop calling the police" because the matter concerning Dancey was simply a "personnel matter";

- ¶¶ 88-89: RH demoted Plaintiff on October 18, 2013; and

- ¶¶ 90-92: LH terminated Plaintiff on October 23, 2013.

Pl.'s Reply 10-11.

Plaintiff submits these allegations combine to establish a plausible claim that her

termination violated the public policies enunciated in S.C. § Code 16-9-340. She avers she was

terminated in part based on her repeated complaints and her clear statements that she wanted

Dancey to be fired, her refusal to stop talking with the police when they came to the dealership

the day of the assault, her repeated phone calls to the police, complaints about Dancey's

presence, and statements that she would pursue the criminal charges against him which were

filed. Pl.'s Reply 11 (citing PAC ¶ 92). Plaintiff indicates Dancey later pleaded guilty to the charge of Disorderly Conduct. *Id.* (citing PAC ¶ 63).

Defendants argue the PAC is insufficient as it "does not contain a single allegation that Plaintiff had any involvement or participation as a witness with any of Mr. Dancey's criminal proceedings, or indeed in any judicial proceeding." Defs.' Mem. 17. Further, they submit that, even assuming Plaintiff did have some further involvement in those criminal proceedings, she does not allege Defendants were ever aware of that involvement, nor did they attempt to obstruct it in any way. *Id.* In addition, Defendants submit the amendment to the wrongful termination claim should be denied as futile because the PAC contains "no allegation that her termination violated § 16-9-340," and the policies articulated in the PAC—"of encouraging employees to report criminal conduct and to make truthful statements to law enforcement," PAC ¶ 131—was rejected by *Taghivand*. Defs.' Mem. 17.

Having carefully considered the PAC itself and the arguments presented by the parties, the undersigned is of the opinion that Plaintiff's wrongful termination in violation of public policy claim would not survive a Rule 12(b)(6) challenge, making that portion of the PAC futile. Simply stated, Plaintiff's PAC does not contain factual allegations that she was actually involved as a witness in any proceeding against Dancey (or anyone, for that matter). Rather, the only action Plaintiff has expressly pleaded concerning her pursuit of claims against Dancey is her October 18, 2013 call to the police to *report* Dancey's presence at the Dealership because "she believed she had a 'no contact' order in place against Dancey." PAC ¶ 86. Other allegations, such as her "repeated phone calls to the police" and "statements that she would pursue the criminal charges against [Dancey] which were filed[,]" *id.* ¶ 92, do not include specifically concrete involvement with court proceedings. Moreover, nothing in the PAC avers Defendants

were aware of any involvement by Plaintiff in legal proceedings. *Cf.* PAC ¶¶ 93 (noting Plaintiff's former coworker Rodriguez "appeared in court in November, 2013 to testify against Dancey on the criminal charges" and "on information and belief" LH and RH were aware of Rodriguez' court appearance).

At bottom, Plaintiff's allegations, at best, amount to the *reporting* of a potential crime. *Taghivand* found South Carolina's legislature has not set out a clear public policy protecting such actions. Because Plaintiff has not pleaded a plausible claim for wrongful termination in violation of public policy, that portion of her PAC should not be permitted to go forward.

D.  Title VII claims

Plaintiff's PAC includes Title VII-based claims for "gender discrimination including harassment, retaliation, and wrongful termination." *See* PAC ¶ 136-44. Defendants challenge this cause of action, arguing her claim for retaliation and for wrongful termination under Title VII cannot survive a motion-to-dismiss challenge and thus should be dismissed as futile. Defs.' Mem. 18-22.

The PAC includes a section called "The Dealership Condoned Sexual and Physical Misconduct." That portion of the pleading provides as follows:

65. The assaults and mistreatment of Ms. Ellis took place in a workplace in which sexual harassment and other acts of gender discrimination as well as other acts of violence repeatedly took place. Ellis routinely rejected the sexual harassment to which she was subjected and routinely objected to and reported to higher managers the sexual harassment of other female employees which she witnessed, and which was reported to her. The assaults of Ellis by Sutter and Dancey, motivated at least in part by Ellis' gender, were a part of a working environment which was very hostile to women employees.

66. For example, in 2012, a female employee accused a male manager of rape. The female employee was unwilling to work any longer at the dealership and resigned.

67. Moreover, on October 18, 2013, in the midst of the Dancey events, a female employee emailed Ms. Ellis to tell her that a male salesman had told her "he wish[ed] she would sit on his face so he could die." The female reported that the male had also asked her for her number, and had said that his girlfriend liked women and then called his girlfriend to talk to her. Defendant Bobby Harrelson called Ellis into his office and talked to her about the male employee. He told Ellis that they knew the male employee was "a pervert" but decided to hire him anyway. Harrelson said they were firing the male employee, but he was never fired for this incident. Instead, upon information and belief the male employee was later fired, due to sexual harassment complaints by customers.

68. Ms. Ellis was also the subject of unwanted and unsolicited sexual remarks made by both Harrelson Nissan General Manager Lloyd Edwards and Bobby Harrelson, including remarks about her "wanting them" (this comment was made at least once a week, typically while she was distributing paychecks) and Edwards asking Ellis if she had given "Mr. H" a "blow job", saying "that's his favorite." The blow job comment was made by Edwards to Ellis at least once a week in the last two years of Ellis' employment, usually when she was taking lunch to Mr. Louis Harrelson, or checking on him. Ellis always rejected these remarks and indicated they were unwelcome, by various statements, such as "that's disgusting", "that's enough", "you guys ae disgusting", "why are you talking" that way, or similar remarks, or by rolling her eyes and walking quickly away.

69. Ellis was also called a "whore" by Bobby Harrelson after a disagreement, and Harrelson consistently used that term in Ellis' presence to refer to customers or female employees who were not in his favor. Ellis heard this language constantly (at least once a day) from both Bobby and Lloyd Edwards, as well as the term "bitch" which was usually used more than once a day by Bobby Harrelson and Edwards in Ellis' presence. Ellis consistently rejected these remarks and indicated they were unwelcome, by various statements, such as "that's disgusting", "that's enough", "you guys are disgusting", "why are you talking" that way, or similar remarks, or by rolling her eyes and walking quickly away.

70. On many occasions Ms. Ellis heard Bobby Harrelson and Lloyd Edwards refer to customers and workers as a bitch, whore, slut or other anti-female terms. These terms were typically used more than once a day in Ellis' presence by Bobby Harrelson and Edwards. Ellis consistently rejected these remarks and indicated they were unwelcome, by various statements, such as "that's disgusting", "that's enough", "you guys are disgusting", "why are you talking" that way, or similar remarks, or by rolling her eyes and walking quickly away. Ellis asked Harrelson why he would refer to customers that way when they had simply figured him out?

71. A female customer purchased a Mercedes from the dealership. A Harrelson employee drove it to have it repaired at another location, ran a red light and the car was damaged. The customer insisted on the dealership repurchasing the

vehicle. Both Bobby Harrelson and Lloyd Edwards referred to this customer as "the bitch" in Ellis' presence. This took place in or about April 2011.

72. Defendant Bobby Harrelson and Edwards also referred repeatedly to former employees with the terms "whore", "slut" or "c____." In Ellis' presence. During the last two years of Ellis' employment, this took place several times a month, when a former employee who was female and not in favor was brought up.

73. In front of Ellis Defendant Louis F. Harrelson told a female "everyone knows you are a whore and only after my money."

74. Lloyd Edwards forwarded to a female employee a picture of a large sausage and open beer to his truck with the message "want my sausage?". The female employee showed this to Ellis and she in turn reported it to Bobby Harrelson, who said he would take care of it. This took place in September or October, 2013. Ellis reported this to Bobby Harrelson and told him that he needed to tell Edwards to cut it out or words to that effect.

75. In Ellis' presence, Lloyd Edwards, Bobby Harrelson and Louis F. Harrelson referred to a Nissan representative, as that "red-headed bitch." This took place every time that representative came to the dealership which took place about every three months between 2011 and 2013.

76. On one occasion, Mr. Louis F. Harrelson called Ellis' extension to come to the showroom tower for the sole purpose of making comments about two women customers who he believed to be gay. While the customers were sitting in an adjacent room, clearly in earshot of the conversation, Mr. Harrelson told Trynie, "they want you—they don't want me." When she pointed out that the customers could easily hear him, he simply scoffed and repeated his remarks. This took place in 2013 but in the two years before Ellis' termination, in Ellis' presence Mr. Harrelson had previously referred to female customers who he perceived to be gay in the same manner on multiple occasions.

77. On another occasion, in or about February, 2013, Trynie went to Bobby Harrelson's office. He said "look at this" and directed her to nude Playboy photos on the Internet. He claimed they were pictures of a newly hired female employee and that the employee was a Playboy bunny. Bobby was showing these pictures to anyone nearby. Later that day Lloyd Edwards and Mr. Harrelson were viewing the pictures and inviting Ellis to look at them. This took place a handful of times, until the employee quit in or about April, 2013.

78. This use of the dealership computers to share among the employees pornography and nude pictures of females was not an isolated incident—on numerous occasions during Ellis' employment she went into Bobby's office to talk about her work and saw him staring at the computer, and when she asked what he was looking at he said, "you don't want to know it will only make you

25

mad" and then he laughed. In her last two years of employment approximately twice a month or more Ellis would come upon Bobby Harrelson passing pornographic images of women on to other employees to make comments on and to harass female employees. Ellis repeatedly voiced her objection to Harrelson and Edwards using the computers in this way, by various statements, such as "that's disgusting", "I don't want to see it", "leave me alone", "you guys are disgusting", why are you not out there selling cars instead of looking at that?" or similar remarks, or by rolling her eyes and walking quickly away. Ellis repeatedly told Lloyd Edwards and Bobby Harrelson to turn the computers off and stop showing the porn to employees.

79. On more than a dozen occasions in the last two years of her employment, Ellis complained to Bobby Harrelson about the sexually harassing conduct of co-workers or Lloyd Edwards. Almost always, Harrelson responded with words to the effect "Yeah, I f_____ hear you. I'll take care of it." Often Ellis reminded him that he had not or would not take care of harassment. His response then was "I told you I'll take care of it—now get the f___ out."

80. The Harrelsons' refusal to correct egregious acts of sexual harassment by employees, their own persistent and ongoing participation in and even encouragement of sexual harassment and other demeaning conduct toward women, and their disregard for Ellis' safety and tolerance of two assaults on her by male employees all caused a persistently hostile working environment for Ellis. Ellis was horribly frustrated by her inability to help protect her female coworkers, angry, and very demeaned by the harassment, the failure of anyone to correct the harassment, and the Harrelson's refusal to take appropriate remedial action toward Dancey. The working environment described above also caused Ellis to endure repeated bouts of depression and feelings of lack of self worth.

PAC ¶¶ 65-80.

In considering Defendants' futility challenge to Plaintiff's Title VII claims, the court is mindful that a plaintiff alleging employment discrimination need not plead a prima facie case to survive a motion to dismiss. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 515 (2002); *McCleary-Evans v. Md. Dep't of Transp.,* 780 F.3d 582, 585 (4th Cir. 2015) (finding district court erred by requiring the plaintiff "to plead facts establishing a prima facie case of discrimination to survive a motion to dismiss"). Rather, a plaintiff is "required to allege facts to satisfy the elements of a cause of action created by [Title VII]." *McCleary-Evans,* 780 F.3d at 585.

1)  Sexual harassment based on a hostile work environment

Absent from Defendants' futility challenge is Plaintiff's Title VII claim of harassment based on a hostile work environment. *Cf.* Defs.' Mem. in Support of Mot. to Dism. 13-18 (seeking dismissal of Plaintiff's sexual harassment claim based on a hostile work environment). Because Defendants appear to have acquiesced that Plaintiff's PAC contains a sufficient harassment claim to survive Rule 12 dismissal, the undersigned recommends a finding that this portion of Plaintiff's Title VII claim be permitted to go forward.

2)  Retaliation

Title VII proscribes discrimination against an employee because, in relevant part, she "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Employees engage in protected oppositional activity when, *inter alia*, they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543-44 (4th Cir. 2003). "To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove '(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (*en banc*) (quoting *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405–06 (4th Cir. 2005)).

Here, Defendants concede Plaintiff's termination satisfies the second element—an adverse employment action. Defs.' Mem. 1. To the extent Plaintiff also argues her "demotion" was a distinct adverse employment action, *see* PAC ¶ 141, the undersigned agrees with Defendants that Plaintiff's own allegations indicate her demotion was "retracted," *id.* ¶ 89, and she was not ever demoted.

Defendants contend, though, that Plaintiff has not pleaded a plausible claim of the first and third elements—protected activities that were causally related to the adverse employment actions. Plaintiff contends that she engaged in protected activity by (a) complaining to RH, LH, and Lloyd Edwards about the assaults by Sutter and Dancey; and (b) "complain[ing] about and reject[ing ]" the sexual harassment she alleges took place. PAC ¶ 142. Defendants concede Plaintiff has alleged the first element—engagement in a protected activity—in so far as she has alleges she has complained about sexual harassment. Defs.' Mem. 19. Defendants argue, however, that Plaintiff's complaints about the alleged assaults do not support her retaliation claim, because they were not violations of Title VII, and thus her complaints about the assaults were not a protected activity. *Id.* at 19-20.

In response, Plaintiff submits she has adequately pleaded protected activity based on both her complaints about sexual harassment of herself and others as well as her complaints about her assaults by members of the opposite sex. Pl.'s Mem. 6 (citing PAC ¶¶ 65, 68, 69, 70, 74, 78, 79, 80, 92, 142.) Further, Plaintiff notes paragraph 141 of the PAC, which provides:

> Plaintiff engaged in protected activity [under Title VII] when she complained to [RH], [LH], and [Dealership General Manager] Lloyd Edwards about the assaults and complained about and rejected the harassment outlined in paragraphs 65-80 above. Her complaints were treated with disregard and at times hostility. Eventually she was terminated in whole or in part due to this protected activity.

PAC ¶ 141 (as cited in Pl.'s Mem. 6). Defendants contend Plaintiff's PAC averments that characterize reports about the assaults among the reports about claimed sexual harassment amount to no more than Plaintiff's "own unsupported labels and conclusions," which *Iqbal* does not permit. Defs.' Mem. 21 (citing *Iqbal*, 550 U.S. at 570). Further, Defendants argue Plaintiff's PAC sets out other reasons for the assaults. *See* PAC ¶ 25 (noting Sutter had taken offense to

Plaintiff's advising him he would have to pay for a damaged golf cart); and *id.* ¶¶ 44-48 (noting Dancey had assaulted a male coworker as well).

Plaintiff submits she has set forth a plausible retaliation claim based on her complaints to Defendants—including the complaints about the two assaults by Sutter and Dancey. *E.g.* PAC ¶¶ 28 (averring that during his assault of Plaintiff Sutter repeatedly called Plaintiff a "'bitch'" and said he would "'f**k her up,'" and that Sutter often "referred to women employees and customers in very demeaning terms, including 'fat bitches' and 'little bitches.'"); 53 (averring that during his assault of Plaintiff, Dancey called her a " 'f**king bitch'" and spit on her cheek, and that Dancey often referred to women employees and customers in very demeaning terms, including "'whores' and 'bitches'"). In other words, Plaintiff contends that she has pleaded a plausible retaliation claim because the assaults and the other acts of alleged sexual harassment combine to create a hostile work environment and, in turn, her complaints about all such acts are protected activity.

In this motion-to-amend/Rule 12(b)(6) posture, the undersigned agrees with Plaintiff. Recently, the Fourth Circuit expanded the scope of what may be considered a protected activity in the Title VII retaliation context. In *Boyer-Liberto*, 786 F.3d at 282, the court "made clear that [courts] should [] interpret 'unlawful employment practice' [in the protected-activity realm] broadly." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416-21 (4th Cir. 2015) (quoting *Boyer-Liberto*, 786 F.3d at 282); *see Boyer-Liberto*, 786 F.3d at 282 ("[A]n employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress."). As explained in *Boyer-Liberto*, decisions from the United States Supreme Court require that "Title VII [] be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,'

29

because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" *Boyer-Liberto*, 786 F.3d at 283 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–67 (2006)).[5]

Looking to the *Boyer-Liberto* decision, the *DeMasters*' court reversed the grant of summary judgment on a retaliation claim in part based on the district court's "myopic analysis" of the plaintiff's opposition as a series of discrete acts. *DeMasters*, 796 F.3d at 417. Rather, the court counseled as follows:

> We conclude from this review of the statute and case law that we must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination," *Crawford [v. Metropolitan Government of Nashville and Davidson County, Tenn.*], 555 U.S. 271, 276 [(2009)]; and (2) concerns subject matter that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful," *Boyer–Liberto,* 786 F.3d at 282.

*DeMasters v. Carilion Clinic*, 796 F.3d at 418 (emphasis in *DeMasters*). This recommended result is further supported by the *Boyer-Liberto* court's noting that, in addition to considering epithets at the heart of Boyer-Liberto's hostile work environment claim, a "jury also would be entitled to consider other evidence potentially indicative of" a hostile work environment, including the alleged harasser's treatment of plaintiff throughout her tenure, the harasser's "shouting, spitting, and stalking" and use of the term "'little girl' to refer to plaintiff. 786 F.3d at 281 n.4.

---

[5] In making this recommendation, the undersigned is mindful that *Boyer-Liberto* contains a different factual scenario than that before this court. In *Boyer-Liberto*, the Fourth Circuit reversed the grant of summary judgment, finding that even the one-time use of an especially offensive racial epithet could be the basis for creating a protected activity for that plaintiff's retaliation claim. The differing factual circumstances do not change the tenure of the *en banc* opinion—a broadened scope of what is to be considered a protected activity.

Given this recent expansion of the scope of what may constitute a protected activity in the retaliation/hostile-work-environment context, the undersigned is of the opinion that the "panorama" of Plaintiff's reports of the assaults and of other incidents combine to make all such reports protected activities for purposes of her retaliation claim.

The court has also considered the final prong of Plaintiff's Title VII retaliation claim—a causal connection between the protected activity and the adverse employment action. In arguing Plaintiff has not set out a plausible claim that her protected activity caused her termination, Defendants focus only on the verbal harassment by RH and Lloyd Edwards and the objection to the use of work computers to view pornography. Defs.' Mem. 19-20. They submit Plaintiff had long-complained about these behaviors, and, as such, could not establish a plausible claim that such complaints caused her termination. *Id.* Because they take the position the reports of the assaults by Sutter and Dancey could not be considered protected, Defendants do not examine whether Plaintiff has set out the requisite causal link between those complaints and her termination. Citing no case law other than *Iqbal*, Defendants submit Plaintiff has provided nothing to indicate her termination was caused by her protected activity and that, as such, her retaliation claim would be futile.

In response, Plaintiff submits the close temporal proximity between her October 11, 2013 report of the October 11, 2013 Dancey assault and her October 23, 2013 termination sets out plausible causation. Pl.'s Mem. 7-8. As noted above, the undersigned finds it appropriate to consider all of Plaintiff's complaints—including those regarding the assaults—as protected. Accordingly, the undersigned agrees with Plaintiff that she has set out plausible causation. In considering the causal link between protected activity and the adverse action, the court notes that "'temporal proximity' between the protected activity and the adverse act will satisfy this prong at

the pleading stage." *Townes v. Md. Dep't of Juvenile Servs.*, No. JKB-15-1093, 2015 WL 5928114, at *5 (D. Md. Oct. 8, 2015); *see Pierce v. Universal Steel of N.C., LCC*, No. 1:13CV158, 2014 WL 868858, at *3 (M.D.N.C. Mar. 5, 2014) (finding temporal proximity between protected activity and termination sufficient at pleadings stage). Plaintiff should be permitted to pursue her Title VII retaliation claim past the pleadings stage.

3) Title VII wrongful termination

Finally, Plaintiff's Title VII claim asserts that she was terminated because of her gender. *See* PAC ¶ 142. Title VII prohibits employers from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C.A. § 2000e–2(a). Absent direct evidence, the elements of a prima facie case of Title VII discrimination are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). At this juncture, though, Plaintiff is not required to set forth facts establishing a prima facie case of discrimination. *See McCleary-Evans*, 780 F.3d at 585. Rather, to state a claim of discriminatory discharge, Plaintiff is required to allege sufficient facts to establish a plausible basis for believing that she was discharged "*because of* [her] gender." *See id.* (quoting 42 U.S.C. § 2000e–2(a)(1)) (requiring a plaintiff claiming discriminatory failure to hire to allege facts that her employer failed or refused to hire her "*because of*" her race or sex).

Here, Plaintiff avers her termination was "motivated in whole or in part because of her gender," that she "was meeting and exceeding the legitimate expectations" of Dealership at the time of her termination, and that LH "had no valid basis for firing her, but fired her anyway."

PAC ¶ 142. She continues: "[LH] did so in part because he did not want a female employee telling him what to do, and [Plaintiff] had repeatedly been asking for Dancey to be fired and refusing to stop contacting the police about the criminal charges." *Id.* Further, Plaintiff argues she has pleaded facts making it plausible that the reasons given for her termination concerning paperwork deficiencies were pretextual, and she was terminated because of her gender. *See* Pl.'s Mem. 8-9. The PAC also contains general allegations that males and females were treated differently. *E.g.* PAC ¶ 41 (noting LH "objected to female use of profanity while using it himself and accepting the use of profanity by male employees"), ¶ 62 (alleging RH "ignored the complaints of female employees while he was far more responsive to the concerns of male employees.").[6]

While the undersigned believes this is a close call, it is recommended that the wrongful termination portion of Plaintiff's Title VII claim be permitted to go forward. As an initial matter, the undersigned agrees with Defendants' argument that Plaintiff's supposition that LH dismissed her because "did not want a female telling him what to do" is conclusory and conjectural and may, standing alone, be insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678-79.

Nonetheless, it has been recommended that Plaintiff's harassment and retaliation claims should proceed. As discussed above, those claims hinge in part on actions taken against Plaintiff based on her reporting of, *inter alia*, actions related to a purported hostile work environment. Further, at this stage, Plaintiff need not set out detailed facts to support each element of a prima

---

[6] The general formulation of a prima facie case of disparate treatment requires a plaintiff to show that others outside of her class were treated differently. *E.g. Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). Nonetheless, "[t]he facts necessarily will vary in Title VII cases, and the specification []of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973). If Plaintiff is permitted to proceed on her Title VII wrongful termination claim, she will certainly need more to survive summary judgment.

facie case. *See McCleary-Evans*, 780 F.3d at 585. The undersigned finds it plausible, then, that discovery could bear out Plaintiff's claim that her termination was based on her gender. Plaintiff should be permitted to pursue her Title VII wrongful termination claim in an amended complaint.

## VI. Conclusion and recommendation

Based on the foregoing, it is recommended that Plaintiff's Motion to Amend, ECF No. 11, be granted in part. If the district judge adopts this Report and Recommendation, Plaintiff will be permitted to file her PAC, ECF No. 11-1, to the extent allowed within. Plaintiff's Amended Complaint is not to include causes of action for assault, negligent supervision and retention, or wrongful termination in violation of public policy.

Because Plaintiff's Motion to Amend is being considered in full, Defendants' pending Motion to Dismiss the original Complaint, ECF No. 4, may be dismissed as moot.

IT IS SO RECOMMENDED.

January 29, 2016
Florence, South Carolina

Kaymani D. West
United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**